**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 210468-U

Order filed August 29, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 9th Judicial Circuit, Tazewell County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) ) | Appeal No. 3-21-0468 Circuit No. 20-CF-151 |
| LESLI A. JETT, | ) ) | Honorable Paul P. Gilfillan, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HETTEL delivered the judgment of the court.
Presiding Justice Holdridge and Justice Albrecht concurred in the judgment.

**ORDER**

¶ 1     *Held*:  (1) The trial court properly relied on the officers' body camera video, without live testimony, in finding that the State met its *prima facie* burden of proof at the motion to suppress hearing; (2) the prosecutor's comments during closing argument did not constitute reversible plain error; and (3) the court did not abuse its discretion by denying defendant's motion to sever the aggravated battery count from the first degree murder counts.

¶ 2     Defendant, Lesli A. Jett, was charged with three counts of first degree murder and one count of aggravated battery of a child following the death of her boyfriend's four-year-old son. A jury convicted her of two counts of murder and aggravated battery, and the circuit court

sentenced her to 75 years in prison. On appeal, defendant argues that: (1) the court failed to conduct a proper suppression hearing by relying on officers' body camera video; (2) the prosecutor's comments during closing argument constituted reversible plain error; and (3) the court erred in denying her motion to sever the aggravated battery count from the murder counts. We affirm.

¶ 3                                                    I. BACKGROUND

¶ 4        On the morning of February 18, 2020, four-year-old Tate Thurman suffered multiple injuries from blunt force trauma while in defendant's care. He arrived at the emergency room in full cardiac arrest and died two days later. The State charged defendant by information with three counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)) and one count of aggravated battery of a child (*id.* § 12-3.05(b)(1)).

¶ 5        Prior to trial, defendant moved to suppress "any and all confessions, statements, [and] admissions" she made to officers before and after her arrest. Defendant claimed that she was not properly Mirandized, that her statements were elicited in violation of her constitutional rights, and that she was coerced. In response, the State filed a "Motion to Allow the Court to View Video Evidence Prior to Hearing Date." The motion stated that all interactions between law enforcement and defendant were recorded on the body cameras of Officers Todd Vititow, Fernando Alvarez, Dale Orr, and Anthony Fisher. The State asked to tender eight digital versatile discs (DVDs) containing approximately four hours of video recordings from those cameras prior to the suppression hearing (marked as DVD Ex.1-Ex.8). The trial court conducted a brief hearing at which the State indicated that it planned to make a *prima facie* case through the video evidence contained on the DVDs. The court determined that, given the general nature of a motion to suppress and the lack of specificity as to which statements defendant wanted to

2

suppress, it needed to watch the recordings in their entirety. To conserve time, the court granted the State's request to view the videos prior to the suppression hearing with the approval of defendant's attorneys.

¶ 6 At the beginning of the suppression hearing, defendant asked the court to review the body camera video of defendant's arrest on February 26, 2021, provided on a flash drive. The court viewed the video in open court. It then admitted the eight DVDs previously tendered by the State, the written waiver forms defendant signed during her conversations with the officers, and the flash drive of defendant's February 26 arrest for purposes of the suppression hearing.

¶ 7 The State began its argument by acknowledging that it had the burden of moving forward with the suppression motion, given defendant's allegation that her statement was involuntary. It then stood on the video evidence previously submitted and defendant's signed waiver forms as proof of a *prima facie* case that defendant's statements were admissible. Defendant responded by claiming that "at the very least" the February 26, 2020, post-arrest interview conducted at the Peoria County jail should be suppressed (DVD Ex. 8). Using the body camera video of defendant's arrest, defense counsel argued that defendant invoked her right to counsel when officers arrested her on February 26 and there was no indication that she reestablished her waiver of counsel or asked to talk to detectives voluntarily before they interviewed her in jail later that evening.

¶ 8 The court ruled that the State had "established enough to shift the burden to the defendant" and then inquired if defendant wished to cross-examine any of the officers to rebut the State's case, indicating that it would continue the hearing to allow counsel to issue subpoenas and/or question the officers. Defense counsel indicated that he would like to cross-examine Orr, Alvarez, and Fisher.

¶ 9        After a brief recess, the prosecutor noted that Vititow, Alvarez, and Fisher were in the building and could be called to testify immediately if the defense wished to call them as witnesses. The prosecutor reiterated the State's position that a *prima facie* case had been established by the video evidence and argued that the responsibility had shifted to defendant to present witnesses to refute that the statements were made voluntarily.

¶ 10        The trial court concluded that the State made a *prima facie* case and stated: "Now, back to the question if the defense attorneys want to talk to any of these three officers that are present today on these issues?" Defense counsel replied that he "would accept the Court's ruling and move forward." The following conversation then occurred:

"MS. MARA MISHLER [(ASSISTANT STATE'S ATTORNEY)]: Judge, just so I can make sure that we're clear because miscommunication has been the name of the game today, the defense is not calling any other witnesses as it relates to the motion to suppress now that the burden has been shifted, is that correct?

THE COURT: We did cover that they don't want any of the three today. I guess the only other one—I mentioned three earlier. Apparently, there's a fourth one. The three here that they don't want to talk to, there's Orr also. Does that include Orr? You don't wish to call him for the purposes of this motion to suppress?

MR. MICHAEL BRANDT [(DEFENSE COUNSEL)]: Correct."

Defendant rested without presenting additional evidence.

¶ 11        In rebuttal, the State presented Detective Fisher. Fisher testified that he was present when defendant was arrested at the gas station on February 26, 2020, and he heard her invoke her right to have an attorney present for questioning. At the jail later that day, defendant asked to speak to

4

Orr and Fisher again. Neither officer initiated the post-arrest conversation. Fisher then identified the video recording of that in-custody interview. Defense counsel declined to cross-examine Fisher. The trial court denied defendant's motion to suppress.

¶ 12     Prior to trial, defendant moved to sever the first degree murder counts from the aggravated battery charge. At the hearing, defense counsel insisted that the continued joinder of all four counts would make it more difficult for counsel to present a defense. The State argued that it was not using prior acts of abuse to support the aggravated battery charge. The court then stated: "Based on what I've just heard, do I understand that the State will be presenting, if it goes to trial, Count 4, the argument that the injuries of this battery to the child occurred within hours or a day thereof of February 18th?" The prosecutor agreed, and the trial court denied the motion.

¶ 13     At trial, the facts revealed that when paramedics arrived at Jeremy Thurman's home around 9:12 a.m. on February 18, 2020, they found Tate lying on the living room floor dressed only in his underwear. Defendant, Jeremy's girlfriend, was performing CPR on Tate. She was "frantic" and asked the paramedics to please help. Defendant was the only person home with Tate. She told the emergency medical technicians that Tate constantly ran into things and that he slipped and fell that morning.

¶ 14     Dan Turner, one of the treating paramedics, testified that Tate was in "full cardiac arrest" when they arrived. He was unconscious, his eyes were closed, and he was not breathing. Turner stated that defendant's chest compressions were ineffective because she "wasn't pushing hard enough or deep enough." Turner noticed that Tate had bruises all over his body, covering his head, torso, and legs.

¶ 15     Defendant was the only person home with Tate. Jeremy and Cortez Moss worked together as bricklayers. They left for a job in Champaign around 5:20 a.m. that morning. Tate's

5

seven-year-old brother, J.T., attended school in East Peoria. The school bus picked him up at approximately 8:07 a.m.

¶ 16　　　　Officer Vititow arrived at Jeremy's house after the paramedics transported Tate and interviewed defendant briefly. He recorded the interview on his body camera. The body camera video and corresponding transcript were then identified and admitted without objection (State's Exhibits 10-11 from DVD Ex. 4). In the video, defendant states that Tate is constantly running into things. She tells Vititow that she was cleaning the fish tank that morning and that Tate slipped and fell on some water. Vititow testified that defendant did not appear to be wet and that he did not notice any water on her clothing. She was upset as they spoke but was able to answer his questions appropriately.

¶ 17　　　　Detective Dale Orr also spoke with defendant at the house shortly after the paramedics left. His conversation with defendant was also recorded on his body camera and the video and transcript were admitted and published to the jury. (State's Exhibits 150-151 from DVD Ex. 7). In that video, defendant states again that Tate was injured when he slipped and fell on some water on the floor near the kitchen as she was cleaning the fish tank. Defendant shows Orr the spot on the floor where he fell. There is no water on the floor in the video, but Orr testified that there was water on the floor by the dishwasher. On the video, defendant stresses that Tate is very "clumsy" and "runs into things all the time." She says he vomited the night before. She then tells Orr that J.T. and Tate are always wrestling with each other. Defendant also mentions that Tate ran into a door and fell down the stairs to the basement recently.

¶ 18　　　　Detective Alverez arrived at the hospital shortly after the paramedics delivered Tate to the emergency room. He and Detective Fisher interviewed defendant in an empty exam room at approximately 11:52 a.m. on February 18, 2020. Alverez identified Detective Fisher's body

6

camera video of the conversation they had with her that morning. Both the video and the transcript were admitted into evidence. (State's Exhibit 142-143 from DVD Ex. 6). During the interview, Fisher reads defendant her *Miranda* rights and she signs a written waiver form. She tells the officers again that Tate fell after he slipped on some water near the fish tank. She tried to help him, but he would not get up. He was conscious, and he was not crying.

¶ 19 Detective Alverez returned to the exam room a few minutes later and photographed defendant's hands and fingers, showing that her nails were chipped and discolored. He turned his body camera video on when he entered the room. That video was also admitted and published to the jury without objection. (State's Exhibit 144 from DVD Ex. 6). While Alverez takes the pictures, defendant states that her hands are stained because she recently dyed her hair black.

¶ 20 Defendant spoke with Detective Orr a second time on February 19, 2020. Orr interviewed defendant in a small waiting room at the hospital. Over defense counsel's renewed objection, the body camera videos and transcripts of the interview were admitted and published (State's Exhibits 152-154 from DVD Ex. 7). At the beginning of the interview, Orr informs defendant of her rights and she signs a *Miranda* waiver form. Again, she denies any wrong-doing and claims that Tate is prone to injury. She tells Orr that she was cleaning the fish tank on the morning of February 18, and Tate slipped and fell. She seems confused and frustrated by the detectives' questions and denies abusing Tate. She tells Orr that she probably injured Tate while she was giving him CPR.

¶ 21 Erin Bowers, a crime scene investigator for the Illinois State police, took photos inside Jeremy's home. She noticed water on the kitchen floor near the dishwasher. She photographed the area. The home had two fish tanks that she photographed. One tank was near the kitchen, just

7

inside the back living room area. Bowers also photographed professional wrestling items in J.T.'s bedroom.

¶ 22        Dr. Jonathan Gehlbach treated Tate in the emergency room at OSF St. Francis Medical Center (OSF). He testified that Tate was lifeless and pale and in cardiac arrest when he arrived. His body was covered in bruises and lacerations. The bruises appeared to be consistent with multiple forceful injuries. Tate's clavicle was also fractured, which would have caused immediate pain. A computerized tomography (CT) scan of his abdomen showed active bleeding. Tate's injuries did not appear to be consistent with slipping on water or falling down the stairs. Dr. Gehlbach opined that his abdominal injuries caused him to go into cardiac arrest, which eventually resulted in his death.

¶ 23        Pediatric surgeon Dr. Anthony Munaco performed two abdominal surgeries on Tate on February 18, 2020. The first surgery revealed a significant amount of abdominal bleeding, severe damage to the lower right quadrant of the abdomen, and a large tear of eight to ten centimeters in the mesentery, which connects blood vessels to the bowel. Dr. Munaco opined that such a large tear to the mesentery would likely be caused by a high velocity or strong force injury and would result in a complete disruption of blood supply to the intestines. A fall would likely not cause a mesentery tear of the nature Tate suffered. Dr. Munaco noted that the mesentery is relatively difficult to injure and stated that Tate's injuries were likely caused by a strong person inflicting repeated blows or kicks to the abdomen.

¶ 24        Dr. Munaco explained that without a supply of blood, the bowel will die within approximately 6 hours. In Tate's case, the bowel still looked healthy during surgery, which began at approximately 11:50 a.m. Since the bowel showed almost no progress toward deterioration, Dr. Munaco opined that the abdominal injury resulting in the mesentery tear

8

occurred, at most, three hours earlier. He described that the abdominal bleeding caused by the tear would have resulted in unconsciousness and the loss of a pulse within 30 minutes of receiving the injury. Dr. Munaco stated that in his medical opinion, Tate's internal injuries were caused by "repeated strong force blows to the abdomen."

¶ 25      On February 20, 2020, doctors completed two separate examinations and concluded that there was no metabolic activity in the brain. Dr. Gehlbach testified that the abdominal trauma Tate suffered caused him to experience cardiac arrest, which led to oxygen deprivation in the blood supply, which ultimately resulted in brain death. He stated that Tate's injuries and resulting death were not consistent with the explanation he was given, that Tate slipped in a puddle or that he fell down the stairs a few days earlier. In Dr. Gehlbach's medical opinion, Tate's injuries were suspicious for child abuse.

¶ 26      Dr. Channing Petrak is the medical director of the pediatric resource center at OSF. She specializes in evaluating children where there is a concern of abuse or neglect. Dr. Petrak examined Tate on February 18, 2020, reviewed his medical records, and studied his autopsy report. When she examined Tate on February 18, he had multiple bruises on his head, face, mouth, back, thighs, arms, and feet. She described the injuries depicted in Tate's photographs in detail. In sum, he had bruises, abrasions, and lacerations covering most of his body.

¶ 27      Dr. Petrak testified that ground level falls are common in four-year-old children, but serious injuries from such falls are rare. The injuries to Tate's head and face were not consistent with a fall because there were too many planes of injury. Because Tate's facial injuries covered multiple planes, she opined that they were inflicted due to child abuse.

¶ 28      She further testified that abdominal injuries require more force because there is nothing firm to crush the tissues against. She echoed Dr. Munaco's assessment that the multiple

9

abdominal injuries Tate experienced "clearly" showed there was not just one impact. She testified that given the severity of the abdominal injuries, symptoms of internal bleeding would have begun within minutes of the injury, causing lethargy and then unresponsiveness quickly. Those injuries were not consistent with a ground level fall or a fall down the stairs. She opined that the cause of those injuries was blunt force trauma, which means the abdomen strikes something "very forcefully," from punching, kicking, or stomping. She opined that the abdominal injuries were inflicted due to child physical abuse and were inconsistent with infliction by another child. "[B]ecause the [abdominal] injuries were so severe and in multiple areas, you would not expect those injuries to occur from typical kids playing or even playing roughly roughhousing."

¶ 29    Dr. Petrak noted that Tate had several defensive injuries, including multiple bruises to the forearms and the back, which, again, were not consistent with a ground level fall or a fall down the stairs. She opined that the injuries to Tate's back were inflicted due to child abuse. Tate also had a broken clavicle, which would have caused immediate pain, and suggested abuse. Finally, Dr. Petrak testified that Tate's autopsy report revealed bruising on his scrotum and there was a hematoma of the right testicle caused by blunt force trauma. She believed the testicular injury was also highly suspicious for abuse.

¶ 30    Forensic pathologist Dr. Amanda Youmans conducted an autopsy and observed an "extensive number of injuries" on Tate's body. She noted injuries to his head, face, neck, chest, abdomen, genital, back, buttocks, both arms, both legs, and his feet and hands. Dr. Youmans explained that she categorized bruising as (1) "acute," for injuries happening recently, (2) "sub-acute," for injuries that are healing, and (3) "remote," for injuries that are fully healed. She described several external bruises, abrasions, and scabbed lesions, as well as other internal deep

10

bruising. There were 84 separate injuries from 84 separate impacts on Tate's head and face. The bruises and abrasions all over Tate's head were acute or abrupt onset; they were not consistent with a fall down stairs or a ground level fall. His clavicle was broken all the way through. It was an acute injury because there was no evidence of healing. There were nine total internal injuries to the abdomen, which were all acute and were not consistent with a fall. She counted 55 separate injuries to his back, which were also inconsistent with a fall or a fall down stairs. The visible bruises on his back were all acute. During the autopsy, she also discovered bruising around the right testicle. In total, Dr. Youmans noted 260 separate injuries on Tate's body, all of which were consistent with physical abuse. She testified that each injury was consistent with blunt force trauma and that "each injury is equivalent to at least one impact, so I can say there were at least 260 impacts." All 260 injuries were consistent with physical abuse. The fatal ones were the injuries to the abdomen that caused the mesentery tear.

¶ 31        Jeremy testified that Tate and J.T.'s mother was deceased. Lesli and her son moved in with Jeremy and his sons in May of 2018. Lesli agreed to watch Tate and her son while Jeremy was at work. Jeremy described Tate as in perpetual motion. He knew that his boys wrestled and that Tate was "clumsy" and bruised easily. He had never seen injuries on Tate like the ones he had on February 18, 2020. Jeremy also testified about other injuries suffered by Tate prior to February 18. Most of the injuries happened while he was at work. In October 2019, Tate fell in the bathtub and was diagnosed with a concussion. In December 2019, defendant told him that Tate accidentally ran into a door and cut his face. Jeremy also testified that Tate fell down the stairs a few days before his death and vomited the night before he was taken to the hospital.

¶ 32        Jeremy identified numerous text messages he received from Lesli between fall 2019 and early 2020 expressing her frustration with Tate's toilet training. Defendant told Jeremy that Tate

11

"makes me mean and shitty and that's fucked up." She stated: "I can't deal with all this stress and shit anymore, I just can't." She was upset with Jeremy for always defending Tate. She said she could not "deal with [Tate] all day" and that she was tired of cleaning up after him when he wet the bed. On the night of February 17, 2020, they fought about Tate again, and defendant complained that Jeremy did not have enough time for her or her son.

¶ 33    Several witnesses also testified as to J.T.'s interest in professional wrestling. They testified that J.T. watched wrestling on television, played with wrestling figures, and had wrestling memorabilia in his room at home. Jeremy testified that he showed J.T. some "moves" of the star wrestlers and that J.T. would sometimes "slam Tate around." Several videos were also admitted which depicted J.T. and Tate wrestling.

¶ 34    Last, defendant testified that she became Tate's daily caretaker when she moved in with Jeremy in March 2019. Tate was very active. Toilet training him was difficult, but he was improving. J.T. and Tate liked to wrestle. J.T. was obsessed with professional wrestling and was "very rough" with Tate. Defendant continued to maintain that she did not batter or abuse Tate. On the morning of February 18, she did laundry, helped J.T. get ready for school, and went upstairs with a waffle for Tate. She went back downstairs to clean the fish tank. Later, she heard Tate come down the stairs and fall. She did not know exactly what happened.

¶ 35    In his closing argument, the prosecutor stated:

"And I ask you to sit there for a minute and image that in your mind, this little boy taking 20 blows right to the forehead, more than 80 to his head and face as a whole, more than 260 to his entire body, and she asks you to believe that a seven-year-old did that. How long do you think that took, 260 blows? If it was one blow per second without stopping, no slowing down to catch her breath, no pause in

12

contact because Tate is maybe scrambling to try to get away, just unending, that's 260 seconds. That's almost four and a half minutes. This was hard work killing this little boy. *** This was a job that would wear a person out, and she asks you to believe that a seven-year-old did it."

Defense counsel objected. The trial court denied the objection and instructed the jury that the attorneys' arguments were not to be considered as evidence.

¶ 36 The prosecutor continued, reviewing the medical evidence with the jury. He then commented:

"And do any of you think that a child could take four and a half minutes of being beaten relentlessly and he wouldn't be screaming and hollering the whole time? And keep in mind, Dr. Youmans told you this was a minimum of 260 blows because she's assuming that there was never any impact that hit the same place twice, so 260 seconds is a reasonable approximation of the minimum time that this took. *** She wouldn't hear Tate crying and screaming for help?"

Defense counsel did not object.

¶ 37 The jury found defendant guilty of first degree murder under count 1 (intentional murder) and count 3 (knowing murder) and aggravated battery of a child under count 4 but not guilty of first degree murder as charged in count 2. The trial court merged counts 1 and 4 into the murder conviction under count 3 and sentenced defendant to 75 years in prison.

¶ 38 II. ANALYSIS

¶ 39 A. Lack of Testimony at the Suppression Hearing

¶ 40 Defendant first claims that the trial court failed to conduct a proper suppression hearing by allowing the State to meet its burden of demonstrating that her statements were voluntary by

13

presenting the officers' body camera recordings without any sworn testimony. Specifically, defendant argues that section 114-11 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/114-11 (West 2020)) requires the State to present "live witnesses" to prove that a defendant's statements were voluntary at a suppression hearing. She claims that the court's ruling, based only on body camera evidence, violated pretrial motions procedure under the Code and constituted a denial of her right to confront witnesses under the sixth amendment (U.S. Const., amend. VI).

¶ 41         Section 114-11 of the Code provides, in part:

"Motion to Suppress Confession.

(a) Prior to the trial of any criminal case a defendant may move to suppress as evidence any confession given by him on the ground that it was not voluntary.

(b) The motion shall be in writing and state facts showing wherein the confession is involuntary.

(c) If the allegations of the motion state facts which, if true, show that the confession was not voluntarily made the court shall conduct a hearing into the merits of the motion.

(d) The burden of going forward with the evidence and the burden of proving that a confession was voluntary shall be on the State. Objection to the failure of the State to call all material witnesses on the issue of whether the confession was voluntary must be made in the trial court." 725 ILCS 5/114-11(a)-(d) (West 2020).

Where a defendant challenges the admissibility of a confession through a motion to suppress, the burden of proof is on the State to show by a preponderance of evidence that the statement was

14

made freely and voluntarily. *Id.* § 114-11(d); *People v. Slater*, 228 Ill. 2d 137, 149 (2008). Under the preponderance of the evidence standard, the State only needs to present evidence "that renders a fact more likely than not." (Internal quotation marks omitted.) *People v. Peterson*, 2017 IL 120331, ¶ 37.

¶ 42        Prior to 1993, the State was required to call every police officer present at an interrogation whenever a defendant moved to suppress a confession on the ground that it was involuntary. *People v. Rogers*, 303 Ill. 578, 585 (1922); *People v. Wright*, 24 Ill. 2d 88, 93 (1962). This rule was known as the "material witness rule." See *People v. Brooks*, 115 Ill. 2d 510, 516-17 (1987) (applying the "material witness rule" where defendant alleged her confession was involuntary because she was coerced). In *People v. R.D.*, 155 Ill. 2d 122 (1993), our supreme court eliminated the material witness rule. The court reasoned that the rationale for the rule no longer applied because it was based on the lack of constitutional and statutory protections that had since been afforded to defendants. See *id.* at 142 (noting that "[s]ince the material witness rule was created, however, the United States Supreme Court has adopted a number of procedural safeguards aimed at elimination involuntary and coerced confessions"). As examples, the court noted that the credibility of a witness may now be attacked by any party, a hostile or unwilling witness may be examined as if under cross-examination, and a defendant may ask the court to call a particular witness as the "court's witness" to permit cross-examination and impeachment by either party. *Id.* at 141-42. Specifically, the court emphasized that: "[C]urrent rules permit defendants to cross-examine and impeach hostile witnesses, even if the defendant has called that witness to testify at the suppression hearing. These rules have eliminated the need for a rule requiring the State to call all material witnesses at a suppression hearing." *Id.* at 142.

¶ 43        With these protections in mind, the court concluded that a defendant may no longer challenge a trial court's ruling on a motion to suppress solely on the basis that the State failed to call a material witness to testify. *Id.* at 145. Where the trial court feels it is necessary to call all the material witnesses, it should do so; but the trial court is no longer required to call every person present at the interview to determine the voluntariness of a defendant's statement. *Id.* at 138 (citing *People v. Sims*, 21 Ill. 2d 425, 433-35 (1961)). Whether a confession is voluntary or involuntary depends on the competency of the evidence, which is a determination that should be left to the court's discretion. *Id.* at 138.

¶ 44        In exercising its discretion, the court may consider hearsay evidence during a pretrial hearing. See *Peterson*, 2017 IL 120331, ¶ 44 (noting that trial court may consider hearsay evidence at a pretrial forfeiture hearing); *People v. Patterson*, 192 Ill. 2d 93, 111-12 (2000) (acknowledging that under Federal Rule of Evidence 104(a), hearsay evidence is admissible during a motion to suppress hearing even though it is not admissible at trial). Unlike at trial, when deciding preliminary questions concerning the admissibility of evidence during a pretrial hearing, "the court is not bound by the rules of evidence except those with respect to privileges." Ill. R. Evid. 104(a) (eff. Jan. 1, 2011).

¶ 45        At the suppression hearing in this case, the State acknowledged that it bore the burden of proof to show that defendant's statements to the officers were voluntary under section 114-11 of the Code. To satisfy that burden, the State presented body camera video of every officer who interacted with defendant, depicting all the conversations they had with defendant, in support of its argument that defendant's statements were voluntary. The trial court viewed the recordings of those interactions along with the arrest video tendered by defense and concluded that such

16

evidence was sufficient. The court was satisfied that the evidence was competent and that it met the State's burden of proof.

¶ 46     Having viewed the body camera videos, we cannot say that the trial court abused its discretion by relying on the video evidence without live testimony.[1] The video recordings accurately reflected the officers' conversations with defendant. Nothing suggests that the videos were tampered with, that they were electronically altered, or that segments were deleted. Even on appeal, defendant does not argue that the videos misrepresent her responses or interactions with the officers. Moreover, the body camera videos are sufficient, standing alone, to prove by a preponderance of the evidence that defendant's statements were voluntary. The recordings contain audio and video and show the officers' entire interactions with defendant, including the reading of *Miranda* warnings and defendant's signature of waiver forms. Defendant is informed that the body cameras are recording, and she freely interacts with the officers. Thus, additional officer testimony regarding the voluntariness of defendant's statements was unnecessary, as the body camera videos provided an unbiased view of the recorded conversations.

¶ 47     We reject defendant's claim that the State was required to present "live testimony" at the suppression hearing for two reasons. First, the language of section 114-11 of the Code does not mandate testimony at a suppression hearing. Section 114-11(d) provides that "[t]he burden of going forward with *the evidence* and the burden of proving that a confession was voluntary shall be on the State." (Emphasis added.) 725 ILCS 5/114-11(d) (West 2020). Evidence is not

---

[1]  We have found numerous cases discussing or affirming trial court rulings on a motion to suppress where no live testimony was offered. See *People v. Coleman*, 2021 IL App (1st) 172416, ¶¶ 7, 66 (trial court relied solely on electronically recorded interview and transcript at motion to suppress hearing); *People v. Colon*, 2018 IL App (1st) 160120, ¶ 59 (in deciding pretrial suppression motion, trial court did not hear any live testimony); *People v. Macias*, 2015 IL App (1st) 132039, ¶ 38 (same); *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35 (same).

17

synonymous with testimony. Evidence is anything, "including testimony, documents, and tangible objects," that tends to prove the existence or nonexistence of a fact. Black's Law Dictionary (11th ed. 2019). Section 114-11(d) also provides that "failure to call all material witnesses" on the issue of voluntariness "must be made in the trial court" (725 ILCS 5/114-11(d) (West 2020)), which suggests that calling witnesses is not mandatory because the issue can be forfeited.

¶ 48        Second, trial courts may consider evidence on a pretrial motion that is otherwise inadmissible at trial. Illinois Rule of Evidence 104(a) states: "Preliminary questions concerning *** the admissibility of evidence shall be determined by the court, subject to the provisions of subsection (b). In making its determination, *the court is not bound by the rules of evidence except those with respect to privileges.*" (Emphasis added.) Ill. R. Evid. 104(a) (eff. Jan. 1, 2011). Subsection (b) further provides that "[w]hen the relevancy of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding of the fulfillment of the condition." Ill. R. Evid. 104(b) (eff. Jan. 1, 2011). In this case, the body camera recordings themselves fulfilled a condition of fact. A fact is "a circumstance, event or occurrence as it actually takes or took place." Black's Law Dictionary (11th ed. 2019). The video recordings depicted the officers' conservations and interactions with defendant as they actually took place. Thus, the trial court did not violate evidentiary rules by considering the body camera evidence at the suppression hearing without live testimony.

¶ 49        In the alternative, defendant claims that the lack of live testimony violated her constitutional right to confront witnesses. We disagree. A defendant may call any material witness to testify at the suppression hearing if the defendant considers that witness' testimony

18

necessary, even if the State does not call that witness. See *R.D.*, 155 Ill. 2d at 142. Here, defendant had the opportunity to call any of the officers to testify. If necessary, she could have called them as hostile witnesses or asked the court to call them. She decided not to. In addition, the State noted that three officers were immediately available, but defense counsel declined. The court asked if the defendant wished to talk to the officers that were in the building, and the defense informed the court that it did not wish to call any of the officers to the stand, including Detective Orr, who was not named as one of the available officers. Finally, Detective Fisher testified and counsel chose not to cross-examine him. Under these circumstances, we cannot say defendant's sixth amendment rights were violated by the State's failure to call witnesses at the suppression hearing.

¶ 50        Even if the court erred in failing to consider live testimony at the suppression hearing, the admission of the statements was harmless error. See *People v. Patterson*, 217 Ill. 2d 407, 428 (2005) (confrontation clause violations are subject to harmless error analysis). "In determining whether a constitutional error is harmless, the test to be applied is whether it appears beyond a reasonable doubt that the error at issue did not contribute to the verdict obtained." *Id*. Of the statements that were admitted at trial, none of them revealed a confession. Defendant consistently denied any involvement in Tate's death. She maintained that she was cleaning the fish tank and that Tate slipped and fell on the wet floor. She also claimed that some of his injuries may have resulted from a fall a few days earlier down the basement steps or occurred while she was administering CPR. She did not make an inculpatory statement during her conversations with the officers. Moreover, the other evidence presented was not closely balanced. Four expert witnesses testified that Tate's injuries were inconsistent with a fall down the stairs or ground level fall. Their testimony was uncontested. Jeremy and defendant both

19

testified that J.T. wrestled with Tate and was "very" rough with him. But Dr. Petrak testified that J.T. could not have caused the massive and forceful injuries she observed on multiple planes of Tate's body. Evidence also revealed that J.T. was not home during the time Tate suffered the injuries that caused his death. In light of the overwhelming evidence in support of defendant's conviction, we find any error in denying the suppression motion and admitting the statements was harmless.

¶ 51                    B. Prosecutor's Statements During Closing Argument

¶ 52        Next, defendant claims that reversible plain error occurred during the closing argument when the prosecutor commented that Tate's wounds were all inflicted within four and a half minutes. Defendant maintains the prosecutor's comments misrepresented the evidence presented at trial as to the duration of the abusive acts that caused Tate's death.

¶ 53        Initially, defendant acknowledges that she forfeited the issue for review by failing to properly object to the prosecutor's mischaracterization of the evidence at trial. See *People v. Jackson*, 2022 IL 127256, ¶ 15 (to preserve an issue for review, a defendant must object at trial and raise the issue in a posttrial motion). Recognizing the procedural default, defendant seeks review by invoking the plain error rule. The rule permits a reviewing court to consider a forfeited error only if: (1) the evidence is so closely balanced that the error alone threatened to tip the scales of justice against the defendant, regardless of the seriousness of the error, or (2) the error is so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 186-87 (2005). In addressing an assertion of plain error, the first step in the analysis is to determine whether a clear or obvious error occurred. *Jackson*, 2022 IL 127256, ¶ 21. Here, there was no error at all.

20

¶ 54        Generally, prosecutors have wide latitude in the content of their closing arguments. *People v. Runge*, 234 Ill. 2d 68, 142 (2009). They may comment on the evidence and on any fair and reasonable inference the evidence may yield, even if the suggested inference reflects negatively on the defendant. *People v. Nicholas*, 218 Ill. 2d 104, 121-22 (2005). A reviewing court must consider the closing argument in its entirety rather than focusing on selected phrases or remarks. *People v. Perry*, 224 Ill. 2d 312, 347 (2007).

¶ 55        The standard of review applied to a prosecutor's closing argument is similar to the standard used in deciding whether a prosecutor committed plain error. *People v. Nieves*, 193 Ill. 2d 513, 533 (2000). A reviewing court will find reversible error only if the defendant demonstrates that the remarks were improper and that they were so prejudicial that real justice was denied or the verdict resulted from the error. *People v. Jackson*, 2020 IL 124112, ¶ 83.

¶ 56        Here, considering the evidence adduced at trial, the prosecutor's remarks regarding the time required to inflict the abuse was a fair and reasonable inference. Testimony revealed that while Tate sustained a few injuries prior to February 18, 2020, he arrived in the emergency room that morning with multiple bruises, lacerations, and abrasions, most of which were categorized as acute or recently inflicted. Medical experts testified that Tate had a broken clavicle, 84 separate injuries to his head and face, 55 individual bruises on his back, scrapes on his arms and feet, and deep bruising to his scrotum. He also suffered blunt force trauma to his abdomen that caused the mesentery to tear. Dr. Youmans testified that she noted 260 separate injuries on Tate's body and that each injury was equivalent to one impact. Although no expert testified as to the length of time that it took to inflict all the injuries identified on Tate's body, the prosecutor reasonably inferred that the acts of abuse lasted for at least 260 seconds, or 4 and a half minutes. The prosecutor's remarks were based on a fair assessment of the evidence.

21

¶ 57    Further, the prosecutor's comments were isolated statements that the prosecutor made between several specific and accurate references to the expert medical testimony admitted at trial. The brief and isolated nature of the "four and a half minute" comments, in the context of the entire lengthy closing argument, is a "significant factor" in assessing the impact of such remarks on a jury verdict. See *Jackson*, 2020 IL 124112, ¶ 87 (prosecutor's misstatements that bloodstain "matched" defendant and fingerprint was a "fresh print" did not create a pattern of unfairness where they were isolated and made among correct references). The trial court also instructed the jury to disregard arguments made in closing that were not based on the evidence. See *id.* (noting that an instruction to disregard is another "appropriate factor" to consider that diminishes the prejudicial impact of a brief and isolated statement). Accordingly, the two challenged remarks were not so improper and so prejudicial that real justice was denied or that the jury's verdict may have resulted from them. We find no reversible error and therefore no plain error. See *id.* ¶ 88 ("[w]ithout reversible error, there can be no plain error").

¶ 58                                    C. Denial of Motion to Sever

¶ 59    Last, defendant asserts that the trial court erred in denying her motion to sever the murder charges from the aggravated battery charge because trying all four offenses together was confusing to the jury and resulted in prejudice.

¶ 60    Section 111-4(a) of the Code provides that "[t]wo or more offenses may be charged in the same indictment, information or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are based on the same act or on 2 or more acts which are part of the same comprehensive transaction." 725 ILCS 5/111-4(a) (West 2020). Further, "[t]he court may order 2 or more charges to be tried together if the offenses and the defendants could have been joined in a single charge." *Id.* § 114-7. However, if it appears that a

22

defendant is prejudiced by the joinder of separate charges, the trial court "may order separate trials." *Id.* § 114-8(a). The decision to sever is within the sound discretion of the trial court. *People v. Olinger*, 112 Ill. 2d 324, 346 (1986). A trial court abuses its discretion only when its ruling is arbitrary, fanciful, or unreasonable or where no reasonable person would agree with the view it adopted. *People v. Chambers*, 2016 IL 117911, ¶ 68.

¶ 61 There is no precise test for determining whether separate offenses are part of the same "comprehensive transaction." Generally, separate offenses may be charged in a single indictment or information where they are part of the same "general transaction, plan or scheme." See *People v. Key*, 28 Ill. App. 3d 637, 640 (1975). In determining whether defendant's acts were part of the same comprehensive transaction, some of the most crucial factors to consider include: (1) the proximity of time and location of the charges; (2) whether the offenses shared a common method; and (3) whether the same or similar evidence would establish the elements of the offenses. *People v. Fleming*, 2014 IL App (1st) 113004, ¶ 36.

¶ 62 Here, defendant was charged with both murder and aggravated battery of a child for inflicting numerous blunt force injuries on Tate on February 18, 2020. The murder counts alleged that defendant, "on or about February 18, 2020," inflicted "abdominal blunt force trauma" on Tate, thereby causing his death. The aggravated battery to a child count alleged that, "on or about February 18, 2020," defendant caused great bodily harm to Tate by inflicting significant blunt force trauma upon "multiple planes of Tate's body, including his head, neck, clavicle, torso, limbs, and scrotum/testicles." Contrary to defendant's suggestions on appeal, all four charges concerned the same comprehensive transaction that occurred on or about February 18, 2020. The charges shared a common method of injury to the same victim that occurred on the same day and in the same location. Moreover, the charges required similar evidence from the

23

same medical experts to establish the elements of each offense. Thus, the trial court did not abuse its discretion in denying defendant's motion to sever the counts.

¶ 63        Even assuming, *arguendo*, that the trial court erred in refusing to sever the charges, we reject defendant's claim that he suffered prejudice as a result of trying all four charges together. Even when a court improperly joins charges against a defendant, the error will be deemed harmless where the evidence of all the charged crimes would have been admissible in separate trials if not for misjoinder. *People v. Walston*, 386 Ill. App. 3d 598, 609 (2008). An error is harmless if an examination of the proceedings as a whole shows the defendant still would have been convicted had the error not occurred. *People v. Mullins*, 242 Ill. 2d 1, 23 (2011).

¶ 64        In this case, any error was harmless where Dr. Petrak's , Dr. Gelbach's, Dr. Munaco's, and Dr. Youmans's testimony would have been admissible at a trial on charges of first-degree murder and at a separate trial for aggravated battery of a child due to the interrelation of the numerous acute injuries Tate sustained on February 18, 2020. Moreover, the jury was presented with evidence of bruises and abrasion covering Tate's entire body. It heard the testimony of the experts and their descriptions of the brutal abuse he sustained that resulted in his death. Based on this record, any error in allowing the jury to hear evidence that related solely to the aggravated battery charge would not have changed the outcome of the trial.

¶ 65                                   III. CONCLUSION

¶ 66        The judgment of the circuit court of Tazewell County is affirmed.

¶ 67        Affirmed.

24